STATE ex rel. CRAWFORD *vs.* HASTINGS, TREAS-
URER &c.,

and

STATE ex rel. PROUDFIT *vs.* HASTINGS, TREAS-
URER, &c.

ALTERNATIVE WRITS OF MANDAMUS.

Heard together August 12, 1859.]         [Decided February 28, 1860.

*Auditor of State—State Comptroller—State Treasurer—
Constitutional Law—Offices, Terms of.*

I.

The act of May 17, 1858, providing for the appointment, and prescribing the powers
and duties of a comptroller, and making it his duty to examine and pass upon
all claims and accounts audited by the Secretary of State, and to countersign
the same before they shall be paid by the State Treasurer, is in violation of the
constitutional provision, which declares that the Secretary of State shall be
" *ex-officio* auditor." The legislature cannot deprive an officer of power given
him by the constitution, nor transfer it to another. COLE, J., dissenting.

The deputy of the Secretary of State cannot perform the duties of auditor of state
in place of the Secretary. It is a personal trust, and cannot be delegated.
COLE, J., dissenting.

A certificate of the examination and allowance of an account made and signed by
the deputy secretary of state, may be rejected by the treasurer on presentation
for payment, and a mandamus will not be granted to compel its payment. COLE,
J., dissenting.

The act of 1854, providing that the terms of office of judicial officers shall commence
on the first Monday of each year, next after their election, does not apply to
the justices of the supreme court. Their terms of office commence on the first
day of June succeeding their election. COLE, J., dissenting.

Though the Secretary of State, in his capacity of auditor, is authorized to do all
necessary acts connected with auditing accounts and claims against the state,
and to certify them to the treasurer for payment, and although he is for that
purpose the general agent of the state, it does not, therefore, follow that the
treasurer is obliged to pay all claims audited by the secretary, when it is plain
that he had no authority to allow the claim.

Public agents, who act in violation of their authority, that is, of public law, do not bind the public by such illegal acts; and all men are bound to take notice of the authority of such agents.

## II.

The act of 1858, relating to the assessment of taxes, and providing that the Secretary of State should prepare and print the *forms* necessary to carry the act into effect, and forward the same to the clerks of the boards of supervisors of the counties, who should cause to be printed for the use of the assessors of their respective counties, the necessary number of such blanks, did not authorize the Secretary of State to procure to be printed, 135,000 copies of such blanks, at the expense of the state; and the State Treasurer was justified in refusing to pay for such printing, even though the secretary had audited the same.

The relation filed in the case by Samuel Crawford, set forth that he had been elected to the office of Associate Justice of the Supreme Court, and entered upon the duties of the office on the first of June, 1853. That the act of January 3d, 1854, fixed the commencement of the term of the judges of that court to the first Monday of January after the election; and thus extended the term of his office to the first Monday of January, 1856; that his successor was elected in April, 1855, and by the law entitled to enter upon the duties of his office in January thereafter. The relator received his salary up to the first day of July, 1855, and not thereafter, though he had resided all that time in the state, and had not resigned. On the 20th of May, 1859, he had applied to the Secretary of State, who was by the constitution of the state declared to be the auditor of the state, to audit and allow the claim of the relator for the sum of $1000, the amount due him for his salary from July 1855 to January 1856, who audited the same on the 27th of the same month. That on the 6th June, 1859, he presented the warrant for payment to Samuel D. Hastings, the Treasurer of the State, who refused to pay the same. Therefore, he prayed for an alternative writ of mandamus.

The writ was issued on the 22d of July, 1859, and on the 8th of Aug., 1859, the respondent answered, denying that the relator was a justice of the supreme court from the first of July, 1855, to the first of January, 1859. He further answered, that in case this court should be of the opinion that by the law the relator was entitled to hold the office from the first day of July, 1855, to the 1st of January, 1856, then the

respondent averred that the relator, not wishing to hold, use, or enjoy the said office, or to do, exercise, or perform the duties; or to claim, have, or enjoy the rights, privileges, emoluments, or salary of the office, during that period; that he did of his own free will and choice, during all that time, leave and abandon the office, which during the time so unclaimed, unoccupied, and unused, was held used, exercised, and enjoyed, and the duties thereof performed, and the salary thereto attached, was drawn and received from the State Treasury by Orsamus Cole, who was before that time duly elected and qualified as a justice of said court, in place of the relator, with his knowledge and assent. The answer further averred, that all the money by law appropriated to pay the salary of the justices of the supreme court from July, 1855, to January, 1856, had been drawn from the state treasury, and was paid by the treasurer to the persons who, during the time, in fact were the judges constituting said supreme court, and exercising the duties and performing the functions of said court, to-wit., Chief Justice Whiton, Justice Smith, and Justice Cole. That there was not now, in the treasury of the state of Wisconsin, any money applicable to the payment of the claim of the relator. And the answer further averred, that the account and claim of the relator so presented for payment by the respondent at the state treasury, was not, as required by law, countersigned by H. A. Tenney, Comptroller of the State of Wisconsin. Wherefore he had refused to pay the amount claimed by the relator, and submits that he ought not to be compelled to pay the same, or any part thereof, out of any funds in his hands as State Treasurer.

To this answer the relator filed a general demurrer.

*A. D. Smith* and *Geo. B. Smith,* for the relator.

1. The term of office did not expire until January, 1856, and for the full term he has a right to the salary. He never resigned, and never was lawfully ousted. *Vide.* The Constitution, Art. VII, § 15; R. S., 1849, p. 762, § 19; id., 1852, p. 603, § 6; id., 1854, p. 53, § 1; *Johnson vs. Wilson,* 2 New Hamp., 202; *Breese vs. Fox,* 1 Dana, 447.

2. The Secretary of State is, by the constitution, the auditor of all accounts against the state, Constitution, Art. VI, § 2. And therefore, it appearing that the warrant to the relator for the amount claimed, had been duly examined, audited and directed to be paid to said relator by said respondent, it be-

came his duty to pay the same, and having refused the payment, the peremptory writ herein should issue.

3. The warrant of the Secretary of State was in due form, and the payment of the sum of money therein allowed, being a ministerial act, should have been obeyed by him as a mere ministerial officer.

4. The power to audit and allow claims against the state, whether for salaries of public officers or for other services, having been by the constitution, vested in the Secretary of State, no mere act of the legislature could divest him of that power; and the Secretary having exercised it, the power in the given case was exhausted, and it could not become necessary a second time to submit the same to the action of the officer styled " State Comptroller," to ascertain the correctness and legality of the claim, it having been once determined.

5. It was the design of the constitution to place the judicial department of the government, and the members composing the same, beyond and outside the control of any other officer of the government; for this was essential to the independence of the department,, and this was accomplished by affixing the minimum salary of the judges, and prescribing the time or times when that salary should be paid.

6. The legislature having fixed the salary of the judges, and the time and mode of payment thereof, could not alter or change the same during the term of the incumbent. Constitution, Art. IV, § 26.

7. The constitution of the state, or rather the people who saw fit to adopt it, saw fit also to create, and did create, a distinct department of the government of the state, called " administration." Constitution, Art. VI.

8. In prescribing the duties of the several " administrative officers designated in that article of the constitution, the duties of the several members thereof were specifically defined, and the people in adopting the constitution, asserted their willingness to rest upon such guaranties as they had therein provided, and thereby prohibited the interpolation of any other or different agencies. For it is well known in the adoption of fundamental law, it is equally, if not more important, to guard against the *intrusion of unauthorized power*, than to curb and restrain the authorized functionaries essential to its harmonious working.

9. The payment of money by the treasurer out of a specific appropriation, to a person, or in a manner unauthorized by

law, is no payment, and in contemplation of law, such money still remains in the treasury.

*C. Abbott*, for the respondent.

*By the Court*, Dixon, C. J. The position contended for by the respondent's counsel, that the act of May 17th, 1858, providing for the appointment and prescribing the duties of a Comptroller, *does not* invest that officer with power to supervise and control the action of the Secretary of State as auditor, seems to us wholly untenable. It cannot be maintained by any fair construction of the act. The intention of the legislature to clothe him with authority equal to that exercised by the Secretary on all matters pertaining to the indebtedness of the State and claims against it, is manifest from the language used in the second and fifth sections. The second section provides that " the Comptroller shall *examine and pass upon all claims and accounts* audited by the Secretary of State, and if he shall find the same properly verified or proved, and *authorized by law to be audited*, he shall certify that fact upon such claim or account." By the fifth section it is enacted that " he shall countersign all warrants drawn by the Secretary of State upon the State Treasurer, *which shall be authorized by law*, and no warrant shall be paid by the State Treasurer unless the same shall be countersigned by him," &c. The intention to confer upon him the same power possessed by the Secretary in his capacity of auditor, to subject finally to his judgment and determination, all questions touching claims and accounts against the state, as well as to their substance, validity and existence, as to the form in which they are presented and verified, and to give him authority to veto and render inoperative all acts of that officer, whether the same were legally and properly done or not, is so manifest from the foregoing provisions, that comment is deemed unnecessary.

Section two or Art. VI, of the constitution, prescribes in
general terms, the duties of the Secretary of State, and among
other things, declares that "he shall be *ex officio* auditor."
An auditor may, in general, be defined to be a person ap-
pointed to settle and adjust accounts, and state or certify the
results. In a more restricted sense, he may be said to be an
officer whose duty is to examine and verify the accounts of
persons entrusted with the receipt and disbursement of pub-
lic moneys. Bouvier's Law Dic., title "Auditor;" Burrill's
id., same title. As used in our constitution it signifies an offi-
cer whose business is to examine and certify accounts and
claims against the state, and to keep an account between the
state and its treasurer. Since the ratification of that instru-
ment such has been the commonly accepted and uniform
legislative interpretation of the word. Immediately after the
formation of the state government, the legislature, by act, rec-
ognized and specifically prescribed the manner in which the
powers and duties of the Secretary, as auditor, should, in both
these respects, be exercised and performed. Chapter 9, R. S.,
1849, sec. 19 to 25, inclusive. An enumeration of those pow-
ers and duties as there regulated, are unnecessary. With the
exception of some enlargements, made necessary by subse-
quent legislation and the formation of new departments, they
remain the same to this day. Chap. 10, R. S., 1858, secs. 27 to
37 inclusive. Even by the act in question, no direct attempt
was made to impair or modify them. All accounts and de-
mands against the state are in the first instance to be audited
by him in the usual manner. But after they are so audited, it
is made the duty of this new officer, created for that purpose,
to review and correct them; and if in any respect he deems
them illegal or improper, he is empowered to set them aside
and annul his action. The act taken altogether looks like a
studied effort to attain indirectly what it was evident to the
framers, could not be accomplished directly. The result is,

that we have two auditors instead of one, both of whom must act in succession, before any business can be transacted. The question arises whether, under the foregoing provision of the constitution, the legislature have the power to create a second auditor or officer authorized to perform the same duties, whose concurrence is necessary before the acts of the constitutional auditor shall take effect. We think they have not, and that the functions of that officer cannot, in whole or in part, be transferred to, or be exercised concurrently, or otherwise, by any other person or officer. It falls directly within the rule that the express mention of one thing implies the exclusion of another. *Expressio unius est exclusio alterius.*

This rule applies as forcibly to the construction of written constitutions as other instruments. And if its observance ought in any degree to depend upon the character or importance of the instrument under consideration, then no other cases demand so rigid an adherence to it. A constitution being the paramount law of a state designed to separate the powers of government and to define their extent and limit their exercise by the several departments, as well as to secure and protect private rights, no other instrument is of equal significance. It has been very properly defined to be a legislative act of the people themselves in their sovereign capacity; and when the people have declared by it that certain powers shall be possessed and duties performed by a particular officer or department, their exercise and discharge by any other officer or department, are forbidden by a necessary and unavoidable implication. Every positive delegation of power to one officer or department, implies a negation of its exercise by any other officer, department or person. If it did not, the whole constitutional fabric might be undermined and destroyed. This result could be as effectually accomplished by the creation of new officers and departments exercising the same power and jurisdiction, as by the direct and formal abrogation of

those now existing. And, although the exercise of this power by the legislature, is nowhere expressly prohibited, nevertheless they cannot do so. The people having in their sovereign capacity exerted the power and determined who shall be their auditor, there is nothing left for the legislature to act upon. This principle or rule of construing constitutions, has been often laid down and acted upon by courts. It is fully sustained by the following cases recently decided by the court of appeals of New York. *Barto vs. Himrod*, 4 Seld., 483; *Sill vs. The Village of Corning*, 15 N. Y., 297; *People vs. Draper*, id., 532.

In this last case the court, after observing that plenary power in the legislature, for all the purposes of civil government, is the rule, and a prohibition to exercise a particular power an exception, and that the constitution contains but few positive restraints upon the legislative powers, say : " But the affirmative prescriptions, and the general arrangement of the constitution, are far more fruitful of restraints upon the legislature. Every positive direction contains an implication against anything contrary to it, or which would frustrate or disappoint the purpose of that provision. The form of the government ; the grant of legislative powers itself ; the organization of executive authority ; the erection of the principal courts of justice, create implied limitations upon the law making authority, as strong as though a negation was expressed in each instance." This rule of construction extends to every part of the instrument, and if a violation of it is allowed in the case of the auditor, it is difficult to see why it should not be in the case of any other officer or department. Thus, the legislature might with equal propriety create new courts of justice, usurping and exercising the same power and jurisdiction as those established by the people, and a new executive, to correct the mistakes and control the action of the one chosen by them. It seems to us clear, that the legis-

lature could do neither, and that so much of the act under consideration as attempts to transfer to the so-called comptroller the functions of auditor, and to clothe him with authority to control or reverse the acts of that officer, is unconstitutional and void.

These remarks apply with equal force to the practice of permitting the deputy or assistant secretary of state to discharge the duties of auditor. An examination of the statute regulating them, and a moment's reflection, will show that it is an office of great trust and responsibility, the importance of which cannot easily be overestimated. Vast interests are committed to his keeping. In one sense, the entire moneys of the state are under his control. None can be paid out, no disbursement made, without his sanction. All claims and demands against the state must be submitted to his decision. In many respects, his acts are judicial in their nature, and depend upon the exercise of a sound judgment. They are also, in many respects, as we shall presently see, final and conclusive. We are therefore of opinion that it is a personal trust and confidence reposed in him, which cannot be delegated to or exercised by another. It would be unreasonable to suppose that the people, after having entrusted to him the management of such weighty affairs, and provided that they should have a direct voice in choosing him, intended that he might transfer it to any person whomsoever. The relator's certificate is therefore irregular, and payment thereof by the treasurer was for that reason properly refused.

Another point raised and discussed on the argument of this case was as to the constitutionality of the act of 1854, entitled "an act concerning the terms of office of judges of the several courts of this state." Chapter 41, General Laws, 1854. At the argument no question was made upon the construction of the act itself. It was conceded, on both sides, that the legislature intended to change the time of the commencement

of the terms of office of the justices of this court, if they had the power so to do; which it was insisted by respondent's counsel they had not. This was the question argued. Upon this question it was understood that this court had heretofore, on different occasions, resolved, in relation to the time when the justices elected since the passage of that act should take their seats, that the act was constitutional. With these resolutions I was not inclined to disagree, but to regard them as decisive. From this, Mr. Justice Paine dissented. Accordingly, in the statement of the points decided, which, to meet the request of the parties that a decision might be made at once, and in advance of a written opinion, was hastily penned and filed, immediately after the case was submitted, we held, that the act was constitutional.* Since that time, however, I have examined the act more fully, and have concluded that the legislature did not intend to change the terms of office of the justices of this court. This conclusion renders it unnecessary for me to express any opinion upon its constitutionality. This question is fully discussed by Mr. Justice Paine, in his opinion dissenting from the statement so prepared, before this was written, and I wish to say no more upon it, than that I fully concur in the views taken by him. This may perhaps be regarded as a singular instance of the advantage of having a dissenting opinion prepared in advance of that of a majority of the court.

Another question much discussed on the argument, was as to the effect to be given to the decisions and certificates of the secretary of state, as auditor. This question, owing to the irregularity of the certificate issued, is not, strictly speaking, before us. Yet, as it may be said to be fairly raised, in the case of the *State ex rel. Andrew Proudfit*, against the same respondent, which was argued and submitted at the same time with the present, and as it is intended that this opinion

---

* See note at the end of these cases.

shall cover the main points of both cases, it may not be improper to discuss it here. On the part of the relator it was insisted that the secretary of state, as auditor, was the general agent of the government, empowered to determine all claims and demands upon the treasury, and that when he has done so, and has drawn his warrant upon the treasurer, it is conclusive upon the state, as his principal, and upon every other officer, and that in such case the treasurer has no right to refuse payment. The first part of this proposition may be very true. It is said in *Commonwealth vs. Fowler*, 10 Mass., 290, that "the several departments of the government, the legislative, the executive and the judicial, are the agents of the people, in their respective spheres."

And in respect to the auditor, to whom there is a delegation of authority to do all acts connected with accounts and claims against the state, and to certify them to the treasurer for payment, it may be said that he is a general agent. But it by no means follows therefrom, that all his acts are conclusive upon the state. There is a broad distinction in this respect between the acts of general agents of the public and those of general agents of private individuals or corporations. Whilst the latter may, and oftentimes do, bind their principles, when acting beyond the scope of their authority or instructions, yet the former never can. In the case of the latter, it is enough that the agent be apparently clothed with authority to do the act, and that third persons deal with him innocently; then, although he violates the private instructions and directions of his principal, yet he will be bound. Good faith requires this, for he has held him out to the public as competent to do the acts, and to bind him thereby. But it is not so with public agents of the character under consideration. Their warrant of attorney is a part of the law of the land, of which all men, whether they be acting in a public or private capacity, are bound to take notice. They can have

no private instructions, and all men deal with them at their peril, in case they exceed their powers. On this subject I cannot do better than to use the language of Judge Story, as found in § 307, of his work on Agency. He says : " In respect to the acts, and declarations, and representations of public agents, it would seem that the same rule does not prevail, which ordinarily governs in relation to mere private agents. As to the latter, as we have seen, the principals are, in many cases, bound, where they have not authorized the declarations and representations to be made. But in the case of public agents, the government, or other public authority, is not bound, unless it manifestly appears that the agent is acting within the scope of his authority, or he is held out as having authority to do the act, or he is employed, in his capacity as public agent, to make the declaration or representation for the government. Indeed, this rule seems indispensable, in order to guard the public against losses and injuries arising from the fraud or mistake, or rashness and indiscretion of their agents. And there is no hardship in requiring from private persons dealing with public officers the duty of inquiry as to their real or apparent power and authority to bind the government."

Our conclusion, therefore, is that it is the duty of the treasurer in common with every other person to take notice of the extent of the authority of the auditor as a part of the law of the state, and if, as in the present instance, the auditor allows and draws his warrant upon him for the payment of a sum of money, as the salary of a person who was not known or recognized as an officer of government, and did not act as such, or which had under the direction of the same or a previous auditor been paid to another, it was his duty to refuse payment, and thus bring the matter before the courts whose province it is finally to solve and settle all disputed and doubtful questions of law. On the other had, when the

authority of the secretary is clear and provision has been made by law for the payment of the claim audited, then, notwithstanding he may think he has allowed too much or committed an error, still he should not refuse payment. Whereever there has been an appropriation made and power is given by law to the secretary to adjust and determine the amount of the claims to be paid, his decision is final; and it is not for the treasurer or any one else to revise or correct his action.

The demurrer to the return must therefore be overruled.

PAINE, J. I dissent from the conclusion of the court in this case that the relator was entitled to hold the office of justice of this court from the first of June, 1855, to the first of January, 1856. My reasons are as follows: The constitution Art. VII. sec. 4, provided that the legislature might organize a separate supreme court, but that when so organized, it should " not be *changed* or discontinued." The court was organized by the act passed in 1852, for that purpose; the third section of which provided that the term of office of all the justices should commence on the first day of June 1853, that the term of the chief justice should expire with the last day of May, A. D. 1857, that of one of the associate justices should expire with the last day of May, A. D. 1855, and that of the other with the last day of May, A. D. 1859. The relator was one of the justices first elected, and drew the short term, so that by the act organizing the court, his term would expire with the last day of May, 1855. It is conceded that such would have been the result if this act remained in force. And by section 7 of the same act, the term of office of his successor would have commenced on the first day of June, 1855. But in 1854, an act was passed which is as follows: " The term of office of county judges, circuit judges, and justices of the supreme court, shall be for such time as at pres-

ent prescribed by law, *and shall commence on the first Monday of each year next after the election of such officer,* unless otherwise specially provided." And it is claimed that this act had the effect to make the term of Justice Cole, who was elected as the successor of the relator, commence on the first Monday of January, 1856, he having been elected in the spring of 1855, and that, consequently, the relator was legally entitled to hold the office until 1856, under that provision that the justices shall hold until their successors are elected and qualified.

It seems that in fact this act was overlooked at the time, and Justice Crawford relinquished the office, and Justice Cole entered upon the exercise of its duties without question. But the relator contends that in strict law he was entitled to hold the office till the first of January, 1856. And this would have been so if the act of 1854 had the effect claimed for it. But I think it did not, and could not, have that effect.

*First*, it did not, because the act cannot by any fair construction be held to show any intention on the part of the legislature to change the time of the commencement of the term of office of the justices of this court. On the contrary, their language clearly indicates an intention to prevent that effect. For the act organizing this court, as before stated, explicitly provided that the term of office of its justices should commence on the first day of June next after their election. This act of 1854 first makes a general provision as to the length of the term of all judges; and then provides that the term shall commence on the first Monday of January, "*unless otherwise specially provided.*" Now, as to the the term of the justices of this court, it was otherwise specially provided. And, therefore, their terms as to the time of commencement were excepted from the operation of the act, by language as clear as it is possible to use.

But, it may be asked, why were they mentioned at all in

the act, if their terms were not intended to be included in
this provision? I reply that the legislature seem to have con-
sidered it necessary to re-enact generally, that the term of all
judges should be for such time as was then prescribed by law.
Now this may not have been necessary. But the legislature
evidently conceived it to be so; and, thinking so, they might
just as well say that the term of the justices of this court
should be for such time as was then prescribed by law, as to
say the same of the terms of the other judges. It is difficult
to see any necessity for the 'provision at all, but assuming it
necessary, as the legislature did, it was just as necessary to
include the judges of this court, as the circuit judges, or any
other; and that sufficiently explains the use of language in-
cluding them. But the legislature knew that the time of the
commencement of their terms was specially provided for by
the law organizing the court. And, therefore, when they
come to fix the time for the terms to begin, they expressly
limit the application of that provision to cases "not otherwise
specially provided" for. It cannot therefore be held appli-
cable to the terms of the justices of this court, without en-
tirely striking out this material provision of the statute.
Where the statute says that all terms not otherwise specially
provided for, should commence on the first Monday in the
year next after the election, it would be construed to mean
that those terms which were otherwise specially provided for,
should commence at that time, as well as those that were not.
I know of no rule of construction that can justify courts in
taking such a liberty with statutes. Where different provis-
ions are repugnant, the court may give effect to the one which
seems most in accordance with the general intent. But the
rule is well settled that laws must be so construed as to give
effect to all parts if possible. And here there is no repug-
nance between the different provisions of the act, and to con-
strue it as including the terms of the judges of this court

gives no effect whatever to the language, " unless otherwise specially provided."

There was a reason for the act with this qualification.   Because while the terms of the judges of this court were specially provided for, there was considerable doubt and uncertainty as to the time of the commencement of the terms of the circuit judges.   The original act providing for their election did not prescribe the time, and in some of the judicial circuits afterwards organized, the time for the terms to commence was not fixed.   There was therefore need of an act to reduce it to certainty.   But it was certainly very questionable policy for the legislature to attempt to tamper with the terms of the judges of a court, which the constitution declared should not be " changed " after it was once organized.   And where the legislature has taken pains to use clear and explicit language excluding such an intention, I do not feel authorized to disregard their language, and say that the act should apply where they said it should not.

But even if the act could be construed to apply to the terms of the judges of this court, I think it was incompetent for the legislature to enact such a law, on the ground that it would work a change of the court, within the prohibition of the constitution.   It is clear that by the provision of the law organizing this court, it would, from the first of June, 1855, to the first Monday of January, 1856, have been composed of the late Chief Justice Whiton, Mr. Justice Smith, and Justice Cole, who was the successor of Justice Crawford.   But if the act of 1854 could have the effect of extending the time when the term of Justice Cole commenced, until the first Monday of January, 1856, then the court would, under the operation of that act, have been composed of the same three judges first elected.   In other words, this act would have the effect of leaving a judge a member of this court for six months, who would not have remained such under the law by which

the court was established.   Would this be a change of the
court within the meaning of the constitution ?    I think it
would.   The provision made for changing the judges who
constitute a court, seems to me to form one of the essential
elements of the character of the court itself.    Thus if in
respect to a court, the judges of which held their office dur-
ing good behavior, it should be provided that they should
only hold for six years, or *vice versa,* this would   certainly be
a change, and a material change of the court.   Or suppose
in this case the legislature conceiving that it would be wiser
to have judges stay on the bench a long time, had provided
that the terms of office of the successors to the judges first
elected, should not commence until ten years after their elec-
tion ?   It seems to me clear, that this would have been a
change of the court.   And this must be conceded unless it is
said that a change in the judges who constitute a court, is
of so unimportant a character as not to work a change of the
court.

And the change here spoken of must not be confounded
with that change in the judges which might take place un-
der the operation of the act first organizing it.   Such changes
might and would take place, but they would not be within
the constitutional prohibition, because that instrument con-
templated that the act organizing the court should provide
for such changes, and that the manner in which they should
take place, would give character to the court itself.   A change
in the court is not a change in the judges, occurring in ac-
cordance with the law organizing the court, but it is such
a change in the law as necessarily makes the court, at any
given time, composed of other judges from what it would
have been under the operation of the original act.   And it
was precisely this latter change which was produced by the
act of 1854, if valid.

It was conceded on the argument that if the legislature

had provided that the terms of the successors of the justices first elected, should not commence until ten years after their election, this would have been a palpable violation of the constitution. But of what provision? I know of none except that which prohibits a change of the court. But if it would be a change of the court to leave a vacuum of ten years between the terms, so that the prior judges could hold over that long, under the clause allowing them to hold till their successors qualify, it would be a change to provide for a similar vacuum of six months. The change might not be so great, but it would be just as much a change. And if a change, it is void under the constitution. And it is no answer to say that the change was reasonable. The legislature was not allowed to make reasonable changes in the court, but was prohibited from changing it at all.

The constitution limits the full term of office to six years, and although it provides that the judges shall hold during the term, and until their successors are elected and qualified, this latter provision furnishes no sanction for legislation extending the time when the succeeding terms should commence, so as to leave a vacuum between them, which would be a part of no term. It is a provision usual in legislation respecting offices, and was obviously designed to provide only for those cases where, by some unforeseen event, the successor is prevented from qualifying. But if it is construed as warranting legislation, putting off the time when succeeding terms shall begin, if it may be put off six months, I see no reason why it may not be put off six years or ten, or as long as the legislature pleases. If the power exists at all, I know of no limit to it but the discretion of the legislature. And so that body might regulate the time during which judges should hold office at their pleasure.

I think it cannot be said that this question has ever been passed upon by this court. It has never been before them

except as it arose at the successive elections of new judges that have taken place; and then, without any contest whatever, or any thing to induce a very thorough examination of it. At the first election, the act of 1854 was overlooked, and Justice Crawford retired from the bench, and Justice Cole entered upon his duties on the first of June, 1855. At the next election the late Chief Justice was re-elected, and it was of no importance to him whether his new term began in June or January. At the last election it was a subject of conversation among the judges, but as Mr. Justice Smith intended not to occupy the office from June till January, he, in accordance with the opinion of the other two judges, resigned, and I was appointed, though this course was taken partly to save any question that might be made.

I do not consider this kind of action among the judges to amount to a judicial decision. There are certainly reasons why they would not act, under those circumstances, with the same freedom, or the same sense of responsibility, with which they would act in a judicial proceeding. I have, therefore, considered the question as an open one, and have stated my own views in regard to it.

Cole, J. Some of the questions raised by the demurrer to the return made in this case, are the same as were involved in the motion to quash the alternative writ of mandamus in the case of the *State ex rel. Proudfit vs. Hastings,* and as I have fully expressed my views in that case upon them, I need not restate them here. A majority of the court have arrived at the conclusion that chapter 41, Session Laws of 1854, p. 53, concerning the commencement of the terms of judges of the several courts of this State does not apply to the justices of this court. From that conclusion I am constrained to dissent. I have no doubt but that it was intended to apply to the justices of this court, and that it changed the commence-

ment of the term of office of any justice elected after the law took effect, and made it commence on the first Monday of the year, next after the election of such justice. I can give the law no other rational construction. It reads: "The terms of office of county judges, circuit judges, and justices of the supreme court, shall be for such time as at present prescribed by law, and shall commence on the first Monday of each year next after the election of such officer, unless otherwise specially provided."

It must be admitted that this language is rather ambiguous and indefinite, but is it so much so that we cannot ascertain the intention of the legislature in passing it. It evidently was passed for the purpose of fixing the time for the commencement of the term of certain judicial officers. This is apparent upon the least examination. But to the term of what judicial offices does it relate? The act says that "the term of office of county judges, circuit judges, and *justices of the supreme court*, shall be for such time as at present prescribed by law, and shall commence on the first Monday of each year, next after the election of such officer," &c. The act expressly names the justices of the supreme court as the officers, the commencement of whose term of office was to be regulated by the act. But it is said that the language used in the last clause of the section, namely, "unless otherwise specially provided," shows that the act was not intended to apply to the commencement of the term of office of justice of this court, since the commencement of their term of office is specially prescribed in sec. 3 of the organic act, chap. 395, of the Session Laws of 1852, p. 601. If this be a correct view of that law, the question naturally arises, why were the justices of the supreme court enumerated among the officers, the commencement of whose term of office was to be regulated and fixed by this law? Why were they mentioned in that connection, or at all in this enactment?

It is said that the legislature seem to have considered it necessary to re-enact generally that the term of all judicial officers should be for such time as was then prescribed by law. This construction certainly leads to the most strange consequences. Is it to be presumed that the legislature would deliberately do so foolish, so idle, so perfectly unmeaning a thing, as to re-enact what was already the law, and say that the term of all judicial offices should be for such time as has been already prescribed by law? This is charging the legislature, which passed this act, with a degree of stupidity which I am unwilling to attribute to them, if I can by any fair rule of interpretation, place a different construction upon the law.

The object of this law undoubtedly was to produce, as far as possible, uniformity in respect to the commencement of the term of office of all the state and judicial officers. The political year, by the constitution, was to commence on the first Monday of January, and that was about the time that the various state and county officers entered upon their term of office. The term of office of the justices of the supreme court commenced in June, while the commencement of the term of office of the judges of the circuit and county courts was generally the first of January. And to produce uniformity in the commencement of the term of all the offices, as well probably as to contribute to the convenience and regularity of auditing quarter yearly salaries, and keeping the accounts in the various departments, this act of the legislature was passed. The evil to be remedied by the law was not very serious, but it is easy to perceive that an inconvenience did exist.

Again, by the same course of reasoning by which it is shown that the act of 1854 did not apply to the commencement of the term of office of justices of the supreme court because the commencement of their term of office was " otherwise specially provided," would also prove that it could not

apply to the term of circuit and county judges, since the commencement of their term of office was otherwise fixed by law. In the act organizing the old supreme court, it said the "judges shall severally enter upon the duties of their office as soon as elected and qualified." Sec. 3 of the organic act, R. S., 1849, p. 760. This was the provision in regard to the judges elected under that act. By sec. 87, chap. 6, R. S., 1849, it was provided that "the regular term of office of all state and county officers, when elected for a full term, shall commence on the first day of January next succeeding their election." I understand the judges of that court held unanimously, that this provision applied to and fixed the commencement of the term of office of the judges subsequently elected under that act. Whether this was so or not, the organic law and the constitution would determine the commencement and length of the term of office. When the sixth circuit was organized, the law provided that the judge of said circuit should enter upon the duties of his office as soon as elected and qualified, "and shall hold his office for six years from the time he shall enter upon the duties of his said office." Chap. 286, Session Laws, 1850, p. 214. By the law organizing the seventh judicial circuit, the judge of that circuit was to enter upon the duties of his office as soon as elected and qualified, "and shall hold his office for six years from *the time of his election,* and until his successor shall be elected and qualified." Chap. 40, Sess. Laws 1853, p. 40. By the law organizing the eighth circuit, the judge of that circuit was to "enter upon the duties of his office on the first day of January, in the year eighteen hundred and fifty-five, and shall hold his office for the term of six years, and until his successor is elected and qualified." Chap. 13, S. L., 1854, p. 17. Precisely the same provision was made in reference to the commencement of the term of office of the judge of the ninth circuit. Chap. 75, S. L. 1854, p. 94. It will be seen by sec. 1, chap. 86, R. S. 1849, that county

judges were to hold their office for four years from the first day of January, 1850.

If such controlling effect is to be given to the language, "*unless otherwise specially provided,*" as the majority of the court seem to think it must have, I cannot well understand how the law can be held to apply to and fix the commencement of the term of the judges of the circuit and county courts, in view of the provisions of law just cited. I do not think these words should have any such controlling force or effect given to them, but that they are to be considered in connection with the other parts of the section, from all which the intention of the legislature will be manifest. I have no doubt but that intention was to change the commencement of the term of the office of justices of this court, as well as the commencment of the term of the other judges therein mentioned.

It is insisted, however, that the legislature could not change the commencement of the term of office of the justices of the supreme court, because, in effect, that would be to change the court itself, which confessedly it could not do. Assuming that this act changed the commencement of the term of office from the first of June to the first Monday of January thereafter, is it correct to say that this makes a change in the court? The individuals composing this court may change, while the court itself remains unchanged. There has been an entire change in the individuals composing the court since its organization, still it is the same court. In conceding to the legislature the power to change the commencement of the term of office of the justices of the supreme court for a few months, for the purpose of producing regularity and uniformity in the commencement of the terms of the judicial offices of the state, I do not admitt that this power is unlimited. The legislature could not keep in office a judge ten years, as has been supposed, by postponing for that period the commencement of the term of his successor. For the constitu-

*State vs. Hastings.*

tion limits the term of office to six years, and only permits the incumbent to hold over after the expiration of the term until his successor is chosen and qualified, to prevent a vacancy in the court.

I am therefore of the opinion that my term of office did not commence until the first Monday of January, 1856, and that the relator might have held the office until that time, had he seen proper to have done so.

It is needless for me to add that I was ignorant of the existence of the law of 1854, when I qualified and entered upon the discharge of the duties of a justice of this court. My attention was first called to the law in the latter part of the winter of 1857, at the time of the re-election of the late Chief Justice Whiton. Upon that occasion the proper construction of the law of 1854 was a subject of considerable discussion among the members of this court in the consultation room, and we unanimously took the view of it which I have expressed in this opinion.

It is proper that I should express an opinion upon one other matter set up in the return. It is averred therein that " the relator not wishing to hold, use, or enjoy, said office, or to do, exercise and perform the duties, or to claim, have or enjoy, the rights, privileges, emoluments or salary, during the time aforesaid, did, of his own free will and choice, did leave and abandon the same." The demurrer admits these facts to be true, and if they are as alleged, they show a voluntary surrender of the office, and as a matter of course, a waiver or forfeiture of the salary for the time mentioned in the relation.

These observations are all I deem it necessary to make upon the demurrer.

I think the demurrer must be overruled.